## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

LUCAS GUGGENHEIMER,

    Plaintiff,

    v.

WELLPATH, LLC, *et al.*,

    Defendants.

CIVIL ACTION NO. 3:24-cv-02242

(SAPORITO, J.)

### MEMORANDUM

Lucas Guggenheimer, a prisoner litigating *pro se*, proceeds on an amended complaint alleging that he received inadequate medical care for his urological issues, causing permanent damage to his bladder. Before the Court are defendants' motions to dismiss the complaint (Docs. 21, 31); defendants' motions to strike Guggenheimer's proposed Certificates of Merit for his medical negligence claims (Docs. 25, 41); and Guggenheimer's motions for appointment of counsel (Docs. 30, 37).

For the foregoing reasons, Guggenheimer's complaint will be dismissed, but he will be permitted to file an amended complaint within 30 days of this order, and to file an amended Certificate of Merit within 60 days of filing an amended complaint.

## I.    BACKGROUND AND PROCEDURAL HISTORY

Guggenheimer filed his initial complaint on December 26, 2024. On January 29, 2025, this case was stayed due to a petition for Chapter 11 bankruptcy filed by Wellpath Holdings, Inc. in the United States Bankruptcy Court for the Southern District of Texas. *See* (Doc. 14). The stay was lifted on May 29, 2025, following the approval of a bankruptcy plan. (Doc. 19). Defendants then filed a motion to dismiss the complaint for failure to state a claim. (Doc. 21). On July 10, 2025, Guggenheimer filed a response brief (Doc. 26) and an amended complaint, which is now the operative complaint (Doc. 27). *See infra* note 2.

### A. Amended Complaint

In brief, Guggenheimer alleges that he received inadequate care for two related medical problems while in the custody of the Pennsylvania Department of Corrections. First, he suffered difficulty urinating due to "urinary obstructions" and other unknown causes. Second, he was given catheters to urinate, but the lubricant for the catheters was painful, and he was not offered a replacement lubricant. He alleges that because of his pre-existing urinary issues and the lack of appropriate catheter lubricant, he was unable to properly urinate for an extended period and

sustained permanent damage to his bladder.

Specifically, the complaint alleges as follows: On February 25, 2022, Guggenheimer had surgery to remove polyps in his urethra. On April 5, 2022, he told Dr. Phillips, an outside urologist, that he was still having issues urinating despite the surgery. On April 26, he submitted a sick call form: "I'm having serious problems urinating again! I need to see the urologist again and catheters with lubricant that doesn't burn!" (Doc. 27-1 at 10). Because the lubricant burned, Guggenheimer was "only able to use a little bit" of the lubricant, which made catheterization more painful. The lubricant's warning label directed: "If irritation is experienced, discontinue use and notify a physician." On May 22, Guggenheimer wrote another sick call form: "I still have not been to see the urologist again or gotten catheter lubricant that doesn't burn! I have polyps that grow in my urethra and need to be removed ASAP!" (*Id.* at 15).

Four days later, Guggenheimer met with defendant PA Maepearl St. George. He alleges that St. George was "well aware" of his prior surgery, his catheter issues, and "that [his] urinary struggles were due to obstructions." St. George was allegedly "indifferent" to his complaints about catheter lubrication, but scheduled him for a urology consultation,

which was held on July 27, approximately 60 days later. According to Guggenheimer, a 60-day wait reflects that St. George requested a consultation with "routine" urgency, although he contends that his condition warranted more immediate attention. At the July 27 consultation, urologist Dr. Phillips recommended surgery, and on September 12, Guggenheimer had a second surgery to remove additional polyps and a "polyp-like lesion."

The second surgery did not resolve Guggenheimer's urinary issues, and he continued to require catheters. On October 20, CRNP Tiffany Sottile told Guggenheimer that there is "a 'softer' lubricant, but it[']s on back order." On November 22, Guggenheimer told Dr. Phillips that he was having "ongoing problems urinating and that the surgery didn't help." Dr. Phillips referred him to a "reconstructive urologist" to consider further treatment options. *See* (Doc. 27-1 at 35-38). On December 25, 2022, Guggenheimer wrote a sick call and asked when he would get the softer lubricant. St. George responded that the requested lubricant was still on back order, but prescribed "EMLA cream," which Guggenheimer alleges is "a product that said for External Use Only." Four days later, Guggenheimer met PA Taylor Talasky, who told him to "discontinue use

of EMLA cream for catheter insertion. Rx is for external use only." *See* (*id.* at 40-45). On February 22, 2023, he attended another sick call about the lack of a softer lubricant. According to his grievance filed on the same date, PA Gabby Nalley "said she looked and looked" but there was no alternative product available. (*Id.* at 57).

On May 16, 2023, Guggenheimer underwent a cystoscopy (*Id.* at 47-49). After this test, Guggenheimer was allegedly told by the reconstructive urologist "that [he] will have to use three catheters a day" and that he had permanent damage to his bladder for which "nothing else could be done." Guggenheimer was told that his bladder is "like a plastic bag that became overly stretched out from holding so much urine, and now doesn't squeeze right." Guggenheimer contends that his "not being able to catheterize more often due to the pain" of the lubricant prevented him from emptying his bladder more frequently, causing the permanent damage to his bladder.

Guggenheimer's complaint asserts deliberate indifference and negligence claims against "Wellpath, LLC" ("Wellpath"), the prison medical provider, and St. George. He seeks only monetary relief.

### B. Certificate of Merit

On June 6, 2025, defendants filed a "Notice of Intention to Enter Judgment of Non Pros" (Doc. 20) if Guggenheimer did not file a Certificate of Merit in support of his medical negligence claims within 30 days. *See* Pa. R. Civ. Pro. 1042.7. Over the following months, Guggenheimer made several attempts to file a Certificate of Merit or explain why he could not do so.

On June 30, 2025, within the 30-day period, Guggenheimer filed "[his] best attempt at a Certificate of Merit," in which he "certif[ied] that to the best of my knowledge, information, and belief, the complaint I wrote in [the above-captioned case] is meritorious and accurate." Guggenheimer further argued that the Pennsylvania Rules of Civil Procedure are not among the rules listed in the Court's *pro se* prisoner litigation packet, and that "state procedures aren't relevant." *See* (Docs. 23, 24). Defendants moved to strike Guggenheimer's certificate (Doc. 25) and ultimately filed a "Praecipe for Entry of Judgment of Non-Pros" for failure to file a proper Certificate of Merit (Doc. 28).

In response, Guggenheimer argued that as a *pro se* prisoner, he had no access to a medical professional or other medical expert, which

constituted a "reasonable excuse" for his failure to file the certificate under applicable case law. *See* (Docs. 34, 35, 36). He then filed a letter from "Nyree Baker, LPN" (Doc. 38), whose credentials and expertise are not otherwise explained. The letter reads as follows:

> There is reasonable probability that the defendant's conduct fell outside acceptable professional standards. Wellpath and Maepearl St. []George deviated from acceptable professional Standards by scheduling a Consultation with "Routine" urgency when Mr. Guggenheimer couldn't urinate for months and was known to have a problem wi[th] blockages in his urinary tract which is an acute medical issue.

Defendants moved to strike this certificate, arguing among other points that Baker is not an "appropriate licensed professional." Guggenheimer filed a response in opposition. Guggenheimer has also filed two motions for appointment of counsel, premised in part on his difficulty in producing the required Certificate of Merit and his belief that he required an attorney to secure the services of the appropriate licensed professional.[1]

## C. Bankruptcy Release

On August 28, 2025, defendants filed an additional motion to

---

[1] The Court also received a letter from Dawn Swift, who identified herself as the stepmother of Lucas Guggenheimer, and described her efforts to "explore every possible avenue to secure an expert and an attorney" for Guggenheimer. (Doc. 44).

dismiss the complaint based on the bankruptcy plan and confirmation order entered by the bankruptcy court. In brief, they contend that under the bankruptcy plan, all claims against Wellpath and its employees are discharged and must be dismissed unless the claimant timely opted out of the "Third-Party Release," and Guggenheimer failed to do so. *See* (Docs. 31, 32). Guggenheimer objects to the motion, arguing that he did not receive appropriate notice of the release and therefore should be deemed to have opted out.

## II. MOTIONS TO DISMISS

"Under Rule 12(b)(6), a motion to dismiss may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds the plaintiff's claims lack facial plausibility." *Warren Gen. Hosp. v. Amgen Inc.*, 643 F.3d 77, 84 (3d Cir. 2011) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007)). In deciding the motion, the Court may consider the facts alleged on the face of the complaint, as well as "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Although the Court must accept

the fact allegations in the complaint as true, it is not compelled to accept "unsupported conclusions and unwarranted inferences, or a legal conclusion couched as a factual allegation." *Morrow v. Balaski*, 719 F.3d 160, 165 (3d Cir. 2013) (quoting *Baraka v. McGreevey*, 481 F.3d 187, 195 (3d Cir. 2007)).

## A. Bankruptcy Issues

Prior to addressing the merits of the amended complaint[2], the Court will address defendants' argument that Guggenheimer's claims cannot proceed because of the Wellpath bankruptcy plan. The Chapter 11 bankruptcy plan substantially limited the circumstances under which a

---

[2] Guggenheimer filed his amended complaint (Doc. 27) in response to defendants' initial motion to dismiss (Doc. 21). A party may amend its pleading once as a matter of course "no later than . . . 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b) . . . whichever is earlier." Fed. R. Civ. P. 15(a)(1). Guggenheimer contends, and defendants do not dispute, that defendants' motion was placed in the mail on June 12, 2025, and that he mailed his amended complaint on June 30, 2025. *See* (Doc. 26-1). Thus, his timely-filed amended complaint is now the operative complaint. However, because the complaints are essentially identical except for their discussion of administrative remedies, the Court will "consider [defendants'] motion as being addressed . . . to the amended pleading. To hold otherwise would be to exalt form over substance." *Kruise v. United States Dep't of the Army*, No. 3:21-CV-543, 2023 WL 2673945, at *4 (M.D. Pa. Feb. 3, 2023) (quoting 6 Wright & Miller, Federal Practice and Procedure § 1476 (3d ed.)).

plaintiff can pursue legal claims against Wellpath and its employees, but it permitted claimants to opt out of the plan's Third-Party Release. Under the plan, incarcerated claimants were supposed to receive written notice[3] of the deadline to opt out and submit written confirmation of any decision to opt out within 90 days of the confirmation date (May 1, 2025). *See* (Doc. 32-3 at 27, ¶ 178 (Article I.A.178)). A claimant who did not provide timely written confirmation would become a "Releasing Party" and be "deemed to have conclusively, absolutely, unconditionally, irrevocably, and forever, released and discharged" Wellpath and its employees from any claims arising prior to the Effective Date of May 9, 2025. *See* (*id.* at 77-78 (Article IX.D)).

Defendants argue that Guggenheimer did not timely opt out and therefore any claim against them must be dismissed. They did not reply to Guggenheimer's contention that he did not receive appropriate notice of the opt-out deadline. It appears that notwithstanding this issue, any claim against Wellpath itself, even in a nominal capacity, must be

---

[3] The bankruptcy court's Confirmation Order further provides: "Wellpath shall provide notice to all known personal injury and wrongful death claimants of the extended 90-day period to opt out from the Third-Party Release in Article IX.D and File a certificate of service with the Bankruptcy Court." (Doc. 32-2 at 52, ¶ 43).

dismissed. *See, e.g., Thomas v. McFadden*, No. 3:24-CV-00716-KDB-SCR, 2025 WL 2711603, at *3 (W.D.N.C. Sept. 23, 2025) (dismissing a claim against Wellpath despite plaintiff's allegation that she had timely opted out, finding that "no third-party insurance proceeds are available and the costs of continued litigation would have to (improperly) be borne by Wellpath"); *see also* 11 U.S.C. § 524(a)(2) ("A discharge in a [Chapter 11 bankruptcy] case . . . operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.").

The implications for defendant St. George are less clear. First, while the motion describes St. George as a "current/former employee[]" of Wellpath, that is not alleged in the complaint, nor has any evidence been presented to that effect. Moreover, the provision of the plan that governs "Releases by the Releasing Parties" apparently does not apply "in the case of willful misconduct, gross negligence, or actual fraud." *See* (Doc 32-3 at 75-76 (Article IX.D)). Specifically, the provision does not "release . . . any individual from any Claim or Cause of Action related to an act or omission that constitutes actual fraud, willful misconduct, or gross

negligence." (*Id.*). Guggenheimer's complaint arguably alleges "gross negligence" by St. George. *See*, *e.g.*, *Leal v. Pinkerton*, No. 22-CV-1172-RJD, 2025 WL 2049757, at *3 (S.D. Ill. July 22, 2025) (directing parties to address whether the plaintiff's "Fourteenth Amendment [deliberate indifference] claims . . . are not subject to [] release and discharge under Article IX.D of the Plan").

Given these facts, and that the complaint is subject to dismissal on other grounds, the Court will deny defendants' request for dismissal on grounds related to the Bankruptcy Plan, without prejudice to any future motion that addresses the issues described above. Guggenheimer's request that he be deemed to have timely opted out based on a lack of adequate notice, or for any similar relief, must be directed to the bankruptcy court (*In re Wellpath SF Holdco, LLC*, No. 24-90566 (Bankr. S.D. Tex.)). *See* (Doc. 32-3 at 85-87 (Article XII) ("the Bankruptcy Court retains jurisdiction over all matters arising out of, or relating to, the Chapter 11 Cases and the Plan")); *Verticelli v. Commonwealth of Pennsylvania*, No. 25-CV-1463, 2025 WL 2831171, at *5 n.5 (E.D. Pa. Oct. 6, 2025) (claims against Wellpath employees are vulnerable to dismissal if the plaintiff has not opted out or "otherwise taken action in the

Bankruptcy Court").

### B. Merits

Next, the Court turns to the merits of the complaint. Because Guggenheimer fails to state a plausible Eighth Amendment claim, the Court will not exercise jurisdiction over his state law claims as pled, but he will be permitted to file an amended complaint.

Guggenheimer asserts claims against St. George and Wellpath itself. Turning first to St. George, a plaintiff can state a claim under the Eighth Amendment for denial of medical care by alleging (1) a serious medical need; (2) that the defendant was deliberately indifferent to that need; and (3) that the deliberate indifference caused harm to the plaintiff. *See Durham v. Kelley*, 82 F.4th 217, 229 (3d Cir. 2023).

Guggenheimer imputes deliberate indifference by St. George from the fact that he had to wait 60 days for a follow-up consultation. Even accepting Guggenheimer's inference that the delay was caused by St. George's alleged failure to request an urgent referral, "a deliberate indifference claim premised on delayed medical treatment requires a plaintiff to demonstrate that 'the delay . . . was motivated by non-medical factors.'" *Miller v. Steele-Smith*, 713 F. App'x 74, 80 (3d Cir. 2017)

(quoting *Pearson v. Prison Health Serv.*, 850 F.3d 526, 534 (3d Cir. 2017)). "The lack of an identifiable medical reason explaining a treatment delay does not necessarily mean that the delay was motivated by a non-medical reason." *Id.*

In this case, the complaint does not plausibly suggest that the alleged referral for a "routine" consultation reflected deliberate indifference. Guggenheimer allegedly told St. George that his "urinary struggles were due to obstructions"; that he had recently had surgery to address the problem, and that he used a catheter when he "could[n't] urinate at all." Essentially, he described an ongoing, unsolved problem, for which he had already seen a urologist and had surgery. There is no basis to infer that St. George believed he required immediate attention to avoid permanent damage to his bladder, or that there was a "non-medical reason" for the content of her referral. Guggenheimer argues that he was entitled to an "urgent" appointment because his circumstances fit the DOC's description of "urgent care," but even if this somehow equated to a violation of DOC policy, "a violation of prison policy is not equivalent to a constitutional violation." *Washington v. Salamon*, 2022 WL 4096877, at *5 (M.D. Pa. Sept. 7, 2022) (citations omitted).

Guggenheimer also asserts an Eighth Amendment violation based on the four-day period in which St. George prescribed him EMLA cream. The complaint does not describe the circumstances of the prescription, but it appears that St. George prescribed the cream in response to Guggenheimer's complaints about the lubricant and the fact that the alternative lubricant was unavailable. Even if St. George's decision was ill-advised or negligent, the fact that another provider cancelled the medication does not show that St. George was deliberately indifferent for prescribing it. *See Soto-Muniz v. Martin*, 665 F. App'x 226, 228-229 (3d Cir. 2016) ("[D]isagreements over medical judgment do not amount to an Eighth Amendment claim."). Moreover, Guggenheimer does not allege that he was harmed by using the cream for four days, if indeed he did use it. *See* (Doc. 27 at 7 (alleging that St. George "ordered a product that could have seriously harmed me if I used it for catheterization")).

As for Wellpath, a private prison medical provider may be an appropriate defendant under Section 1983 if the alleged violation was the result of a corporate policy, custom or practice. *See Montanez v. Price*, No. 23-2669, 2025 WL 2846695 (3d Cir. Oct. 8, 2025) (citing *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658

(1978)). However, Guggenheimer has not shown that any alleged deficiencies in his care were attributable to Wellpath policies or practices.

Guggenheimer contends that Wellpath, the "vendor . . . responsible for providing finances for inmate medical items," is liable to him for failing to "pay the cost for available alternative" lubricant. He was allegedly told (and does not dispute) that the "softer" lubricant he requested was on back order. PA Nalley reported that she "looked and looked" for a viable alternative but could not find one. Thus, the complaint does not plausibly indicate that he was denied lubricant for any reason relating to cost. The term "back order" generally means that a product is out of stock or otherwise unavailable. *See* https://www.merriam-webster.com/dictionary/back-order (last accessed Oct. 21, 2025). Although this was understandably frustrating given the professed need for the lubricant, it is not clear how the problem was attributable to Wellpath's failure to "provid[e] finances." Nor does Guggenheimer identify a specific policy, custom, or practice applicable to this situation that would sustain liability against Wellpath.

Guggenheimer also faults Wellpath for the delay between his first and second surgeries. Guggenheimer contends that because Wellpath

operates on a "per diem contract structure," it is "financially benefitted by putting off care for inmates," but he does not allege facts supporting an inference that *his* surgeries or appointments were delayed for that reason. General allegations that a prison medical provider had an incentive to save money, or to consider costs in providing health care, do not state a constitutional claim. *See Winslow v. Prison Health Servs.*, 406 F. App'x 671, 674 (3d Cir. 2011) ("[T]he complaint's allegation that Winslow was harmed by 'policies to save money' is exceedingly conclusory; the complaint does not provide any indication [of] what the relevant policies are [or] what basis he has for thinking that 'policies to save money' affected his medical treatment."); *Reynolds v. Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference standard . . . does not guarantee prisoners the right to be entirely free from the cost considerations that figure in the medical-care decisions made by most non-prisoners in our society.").

With no surviving federal claim, the complaint provides no apparent basis for jurisdiction over Guggenheimer's state law negligence claims. When a federal court dismisses all federal claims prior to trial, it "must decline" to exercise jurisdiction over state law claims "unless

considerations of judicial economy, convenience, and fairness to the parties" dictate otherwise. *See Talley v. Clark*, 111 F.4th 255, 266 n.6 (3d Cir. 2024) (quoting *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000)); 28 U.S.C. § 1367(c). At this early stage of the case, no such justification is apparent.[4] Therefore, the complaint will be dismissed, but Guggenheimer will be granted 30 days in which to file an amended complaint. *See Grayson v. Mayview State Hosp.*, 293 F.3d 103, 108 (3d Cir. 2002) (the district court must permit a curative amendment, unless amendment would be inequitable or futile).

## III.   CERTIFICATE OF MERIT

Because Guggenheimer may attempt to reassert his medical negligence claims in an amended complaint, the Court will address the parties' arguments regarding the requirement of a Certificate of Merit.

Defendants seek "judgment non pros" and move to strike Guggenheimer's putative Certificates of Merit. Construing

---

[4] The statute of limitations would not prevent Guggenheimer from re-asserting his dismissed state law claims in state court. *See* 28 U.S.C. § 1367(d) (when a state law claim is asserted in federal court based on the court's supplemental jurisdiction, the period of limitations "shall be tolled while the claim is pending and for a period of 30 days after it is dismissed"); *Hedges*, 204 F.3d at 123-24.

Guggenheimer's responses liberally, the Court interprets him to request (1) that the Certificate of Merit requirement should not apply in this case (Docs. 23-2, 24-2); (2) that he permitted an extension of time in which to submit any certificate of merit, *see* (Doc. 26 at 3; Doc. 34), and; (3) alternatively, that the statement of Nyree Baker, LPN should be accepted as a timely and proper Certificate of Merit, *see* (Docs. 38, 43).

Pennsylvania law requires a plaintiff alleging medical malpractice, or any other form of professional negligence, to file a certificate of merit, which must attest either that an appropriate licensed professional supplied a written statement that there exists a reasonable probability that the care provided fell outside acceptable professional standards, or that expert testimony of an appropriate licensed professional is unnecessary. *See* Pa. R. Civ. P. 1042.3(a). An appropriate licensed professional is "an expert with sufficient education, training, knowledge and experience to provide credible, competent testimony." *See* Note to Pa. R. Civ. P. 1042.3(a)(1). The Certificate of Merit requirement is a substantive rule and applies even in federal court. *See Liggon-Redding v. Estate of Sugarman*, 659 F.3d 258, 264-65 (3d Cir. 2011). A defendant seeking to enforce the rule in federal court "must file a motion to dismiss

the case without prejudice for failing to satisfy the [Certificate of Merit] requirements."[5] *Keel-Johnson v. Amsbaugh*, No. 1:07-CV-200, 2009 WL 648970, at *3 (M.D. Pa. Mar. 10, 2009).

Guggenheimer cannot be excused from the Certificate of Merit requirements based on his *pro se* prisoner status.[6] *See Booker v. United States*, 366 F. App'x 425, 428-29 (3d Cir. 2010); *Mayo v. Cnty. of York*, No. 1:10-CV-1869, 2012 WL 948438, at *1 (M.D. Pa. Mar. 20, 2012) ("The Court is sympathetic to the challenges faced by *pro se* litigants who

---

[5] In Pennsylvania courts, a defendant may seek dismissal for failure to comply by filing a written notice of intention to enter judgment non pros, followed by a praecipe for entry of judgment non pros. *See* Pa. R. Civ. P. 1042.6, 1042.7. Unless there is an appropriate basis to delay dismissal (*see* Pa. R. Civ. P. 1042.7(a)), the prothonotary must enter judgment non pros against the plaintiff. However, that procedure does not apply in the federal courts, because there is no mechanism for a defendant to ask the clerk to dismiss a claim. *See Keel-Johnson*, 2009 WL 648970, at *3. Therefore, any relief requested in defendants' filings requesting judgment non pros will be denied.

[6] Guggenheimer has requested appointment of counsel, arguing in part that he needs an attorney to find a medical professional and obtain a Certificate of Merit. *See* (Docs. 30, 37). Because the complaint will be dismissed on other grounds, and it is unclear if Guggenheimer will be able to file a viable amended complaint, appointment of volunteer counsel would not be appropriate at this stage. *See Montgomery v. Pinchak*, 294 F.3d 492, 499 (3d Cir. 2002) (to justify appointment of counsel, a case must have arguable merit in fact and law). If he files a viable amended complaint, the Court may consider appointment of counsel on its own motion or on a renewed motion by Guggenheimer.

attempt to pursue civil claims while incarcerated. Pennsylvania law makes clear, however, that a plaintiff is not absolved from complying with the certificate of merit requirement simply because he is proceeding *pro se*.") (citation omitted).

Moreover, the putative Certificate of Merit supported by Nyree Baker does not comport with the requirements of Rule 1042.3. Baker attests to a reasonable probability that the alleged scheduling of "a Consultation with 'Routine' urgency" violated appropriate professional standards given Guggenheimer's urinary symptoms. However, the statement does not show that Baker, identified only as an "LPN," is competent to testify as to the precise meaning or implications of a "Consultation with Routine urgency," or the standard of care generally. *See* Note to Pa. R. Civ. P. 1042.3(a)(1); 40 Pa. Stat. Ann. § 1303.512 ("[a]n expert testifying on a medical matter, including the standard of care" must possess "an unrestricted physician's license to practice medicine"); *see*, *e.g.*, *Rightmyer v. Philly Pregnancy Ctr., P.C.*, No. CV 23-1925, 2024 WL 896571, at *3 (E.D. Pa. Mar. 1, 2024) ("As a licensed registered nurse and not a licensed physician, Ms. Swann does not meet the substantive requirements of § 1303.512 and, thus, her [Certificate of Merit] does not

meet the requirements of Pennsylvania Rule 1042.3."). Thus, defendants' motions to strike the non-compliant certificates will be granted.

Under these circumstances, if Guggenheimer files an amended complaint that reasserts his state law medical negligence claims, he will be permitted 60 days from the filing of that complaint in which to file a compliant Certificate of Merit. *See Booker*, 366 F. App'x at 429 (where a *pro se* plaintiff made "a substantial attempt to conform to the requirements" of Rule 1042.3, dismissal without "affording . . . an opportunity to file a compliant" Certificate of Merit would be improper).

## IV.  MAILING ISSUES

Throughout his filings, Guggenheimer repeatedly objects that the defendants are serving legal papers to him through Smart Communications, the DOC's third-party mail processor in St. Petersburg, Florida, rather than his listed address at SCI-Mahanoy. However, DOC policy dictates that only "privileged" mail is sent directly to a prison, while other mailings, including those "addressed to a plaintiff inmate from a defendant's attorney," must be sent to the inmate through Smart Communications. *See Wyatt v. Wilson*, No. 1:23-CV-509, 2025 WL 539687, at *13-15 (M.D. Pa. Feb. 18, 2025)). Guggenheimer may request

extensions of deadlines as necessary to accommodate delays in mail delivery, but there is no indication that defendants are serving documents improperly, and thus any further relief sought will be denied.[7]

## V. CONCLUSION

The foregoing analysis does not diminish Guggenheimer's allegations that he has "suffered, and continues to suffer, greatly, [or that] hindsight called for different treatment than what he received." *Soto-Muniz*, 665 F. App'x at 229. The Court acknowledges his filings documenting the obstacles he faces as a *pro se* prisoner and his attempts to comply with the applicable rules. However, his complaint as pled does not assert a viable Eighth Amendment claim or present an appropriate basis for jurisdiction over his state law claims. Because it is not clear that amendment would be futile, Guggenheimer will be permitted to file an amended complaint, and a corresponding Certificate of Merit. Defendants' motion related to the Wellpath bankruptcy will be denied without prejudice. An appropriate order follows.

---

[7] Guggenheimer alleges that he is "susceptible to retaliation" because the prison staff "can read" his mailings and "does not like prisoners who file lawsuits" (Doc. 30), but he does not allege that any prison staff members have improperly read the mailings or that he has suffered any retaliation.

Dated: October 27, 2025              *s/Joseph F. Saporito, Jr.*
                                          JOSEPH F. SAPORITO, JR.
                                          United States District Judge